Filed 3/1/23  P. v. Wilson CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH MICHAEL WILSON et al.,<br><br>    Defendants and Appellants. | B322501<br><br>(Riverside County Super. Ct. No. INF1500163) |

APPEAL from judgments of the Superior Court of Riverside County, Johnnetta E. Anderson, Judge.  Affirmed as modified with directions (as to appellant Kenneth Michael Wilson); conditionally reversed with directions (as to appellant Jesse Keith Cottom).

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant Kenneth Michael Wilson.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Keith Cottom.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser and Alan Amann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In January 2015, appellant Kenneth Michael Wilson, his older brother Wayne Wilson, and appellant Jesse Keith Cottom[1] planned to sell fake cocaine to an acquaintance. This ultimately resulted in Jesse fatally shooting the acquaintance in the neck. At the time of the incident, Jesse was 17 years old and Kenneth was 20 years old. A jury convicted Kenneth and Jesse of felony murder and attempted robbery.

We conditionally reverse the judgment against Jesse pending the outcome of a new juvenile court transfer hearing pursuant to newly amended but retroactive Welfare and Institutions Code section 707, at which the juvenile court shall determine whether he should be tried in adult criminal court.

We modify the judgment against Kenneth to require a Penal Code section 3051[2] youth offender parole hearing in Kenneth's 25th year of incarceration, and further instruct the court to gather evidence in anticipation of that hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261, 283 (*Franklin*). We do so because we agree with Kenneth that section 3051,

_____

[1] Because multiple individuals involved in this case have the same surnames, we use first names. No disrespect is thereby intended.

[2] Unless otherwise indicated, subsequent unspecified statutory references are to the Penal Code.

2

subdivision (h) violates the equal protection clause to the extent it denies youth offender parole hearings to those who committed life-without-parole (LWOP) offenses while between the ages of 18 and 25 years but guarantees such hearings for 18- to 25-year-olds who commit offenses that result in the functional equivalent of LWOP. (See § 3051, subds. (b)(4) & (h).)

We reject the other constitutional challenges and arguments of trial error raised by either Kenneth or Jesse.[3] Specifically: (1) Jesse contends that the prosecutor engaged in misconduct during her closing argument by impugning the character and credibility of defense counsel; (2) Kenneth contends that substantial evidence does not support that he acted with the "reckless indifference to human life" necessary to support the felony murder conviction against him[4]; (3) Kenneth contends that the trial court reversibly erred in admitting evidence of Kenneth's involvement in a later, unrelated robbery to prove intent to rob in the instant case; (4) Kenneth and Jesse both challenge the statute under which they were sentenced (§§ 190.2 & 190.5, respectively) as violating constitutional prohibitions on cruel and unusual punishment; (5) Kenneth challenges his LWOP sentence as cruel and unusual because

---

[3] In the interest of judicial efficiency, because our reversal of the judgment against Jesse is conditional and, depending on the outcome of the juvenile court transfer hearing, the judgment against Jesse may be reinstated, we address Jesse's other arguments on appeal.

[4] Kenneth does not challenge that substantial evidence supports he was a major participant in the robbery. (See § 189, subd. (e)(3) [defining applicable version of first degree felony murder as requiring both that the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life"].)

3

it is disproportionate to his culpability for the murder; and (6) Kenneth contends that section 190.5 violates the equal protection clause. None of these arguments warrant relief on appeal.

Lastly, we agree with the parties that the restitution order must be modified, certain fees imposed on Jesse canceled, and that Kenneth should receive presentence custody credits.

## FACTS AND PROCEEDINGS BELOW

### A. Background: Individuals and Witnesses Involved

In 2019, the Riverside County District Attorney charged Kenneth and Jesse with first degree felony murder and attempted robbery. Both counts also alleged that Jesse personally discharged a weapon causing death (§ 12022.53, subd. (d)), and that Kenneth was a principal armed with a firearm (§ 12022, subd. (a)(1)).

The events relevant to these charges involved a group of adolescent males, comprised of then 20-year-old Kenneth, Kenneth's older brother Wayne, Kenneth's neighbors Miguel "Mike" Ramirez and his brother Lorenzo Ramirez, then 17-year-old Jesse, and Jesse's younger brother Justin Cottom. Around the time of the crimes at issue (January 2015), this group regularly gathered in the driveway of Mike and Lorenzo's home in La Quinta Cove, which was across the street from Kenneth and Wayne's home. There were surveillance cameras on Mike and Lorenzo's home.

Adrian Vivas and Bradley Olds also had been part of this group at one point, and occasionally joined the others in front of Mike's house.

4

Dylan Sniffin, a friend of Adrian's who lived outside La Quinta Cove, was acquainted with Jesse and Mike from juvenile hall.  His cousin, Ryan Sniffin, is the victim of the crimes at issue.

## B.    January 30, 2015 Fake Drug Deal

Around the end of January 2015, Ryan asked his cousin Dylan if Dylan could connect Ryan with someone to buy an ounce of cocaine.  Dylan thought of Jesse, and Jesse and Ryan arranged to meet on January 30.

At 5:22 p.m. that day, Jesse texted Ryan, "come around 6:30."  At 5:52 p.m., Jesse called Ryan, and at 5:59 p.m., Jesse texted Ryan and arranged to meet at "51960 Ramirez" in La Quinta Cove.

Around 6:19 p.m., Ryan drove his car to the agreed-upon address, taking with him Dylan and Ryan's roommate Noel Reimers.  Once there, Noel knocked on the door of the home, which appeared to be vacant, but no one answered.  She then returned to the car and sat in the front passenger seat.  Dylan sat in the back seat.  At 6:19 p.m., Ryan texted Jesse, "What's up, man?"  At 6:22 p.m., Ryan called Jesse.

Surveillance footage shows Jesse standing in Mike and Lorenzo's driveway at 6:26 p.m. and Kenneth riding up to him on a mountain bike, wearing a sweatshirt.[5]  At 6:27 p.m., both rode their bikes down the driveway and in the direction of the crime scene.

---

[5] Although there was testimony that the time was 7:25 p.m., it is later described as being 6:28 p.m.  Testimony established that the time on the surveillance video was 57 minutes later than the actual time.

At 6:31 p.m., Ryan texted Jesse, "Hey, I got to get headed up the hill." Soon thereafter, Dylan saw three bike riders wearing hooded sweatshirts ride past the car in which Dylan, Ryan and Noel were sitting.

What happened over the course of the next few minutes—the specific circumstances under which Jesse shot Ryan, and what Kenneth was doing when this happened—was the subject of conflicting testimony at trial, which we outline in more detail in the following section.

By 6:38 p.m., Noel and Dylan called 911 on a cell phone, and Dylan told the 911 operator that Jesse had shot Ryan.

A few minutes later, at 6:40 p.m., surveillance footage shows someone running up Mike's driveway. Moments later, surveillance footage shows a person riding down the driveway on a bicycle and to the north and the person who ran up the driveway walking south. At 6:47 p.m., Mike appears in his driveway. At 6:53 p.m., a female walks up the driveway. At 6:58 p.m., Mike walks south. At 7:21 p.m., a person walks, then runs, south.

At the scene of the homicide, in the trunk of Ryan's car, the police found a jacket stained with what appeared to be blood. A pocket contained a gray case holding six little baggies of white powder. A test of the powder taken at the scene was negative for methamphetamine or cocaine. Police also found $555 in cash on the floorboards inside the car and a cigarette butt on the ground by the driver's door. The parties stipulated that forensic testing of the cigarette butt detected male DNA that was not Kenneth's.

Ryan died later that night from the gunshot wound.

### C. Evidence at Trial Regarding Circumstances of Ryan's Death

The evidence presented at trial included testimony and other evidence establishing the general sequence of events, which we summarized above. It also included testimony presenting conflicting accounts of what happened between the time Dylan saw three individuals in hoodies approaching Ryan's car and the time Jesse shot Ryan.

#### 1. *Dylan's Eyewitness Testimony Suggesting Kenneth Was Not Near Jesse at the Time of the Shooting*

The only witness to the shooting who testified at trial was Dylan, Ryan's cousin, called by the prosecution. Dylan testified that, after seeing the three individuals in hoodies drive past on bikes, "one stayed at the top of the street . . . [then] two of them rode down, and one rode back up, which was Jesse. And he rode up to . . . the car." The individual who rode back down did not come to the car with Jesse, but instead waited behind a car at a nearby intersection at the top of the street. Dylan described this rider as being more heavy set than the others, and subsequently identified him as Mike, whom Dylan knew from juvenile hall. Dylan was not sure whether the third rider waited at the top of the street or went elsewhere.

7

Dylan testified that Jesse, alone, rode his bike to the driver's side of the car. Ryan opened his door but stayed seated inside. Dylan got out of the car and shook hands with Jesse. Jesse "got to business" and handed Ryan two baggies of white powder. Ryan opened one of the baggies, examined it, then gave it back. He told Jesse, " 'Let me know if . . . you get some better stuff.' " They said, "Later" and Ryan said, "Bye."

Dylan got back in the car and Ryan closed his door as Jesse rode his bike to the intersection. Jesse then got off his bike and walked back to Ryan's car with his hand in his sweatshirt pocket. The car windows were open. Pulling a gun from his pocket, Jesse told Ryan, "What's up. Give me all your money," and pointed the gun at him. Jesse's hand was shaking. When he touched Ryan's head and neck with the gun, Ryan pushed the gun away. Jesse fired a shot into Ryan's neck.

Jesse fled as Ryan screamed and lunged over Noel and out the passenger side window. Dylan got out of the car and ran trying to get help while Noel held Ryan.

About 10 to 15 minutes after the shooting, Dylan saw Kenneth and another person drive by in a red car. Kenneth and the other individual hung out the windows staring and giving Dylan a "dirty look."

## 2. Testimony Suggesting Kenneth Was Armed and Near Jesse at the Time of the Shooting

### a. Adrian's testimony[6]

Adrian testified that around 10:00 a.m. the day Ryan was shot, Jesse visited Adrian's home, where they used drugs.[7] Jesse told Adrian that he and Kenneth were going to "do a lick" later that night, which Adrian defined as "[a] fast way to get money or something," possibly by committing a robbery. Their plan was to ride their bicycles to Ramirez and Durango streets and try to sell two bags halfway full of baking soda or another white substance as cocaine for $600 or $700. If they could not sell the fake cocaine, they would just take the money. Jesse told him the "lick" was Kenneth's idea, and that Wayne and Kenneth helped plan it. During this same visit, Kenneth showed Adrian a silver .38 revolver.

Two days after Ryan's death, Kenneth again visited Adrian. Kenneth told Adrian that he and Jesse had ridden bikes to Ramirez and tried to sell "these boys in their car" fake cocaine. Adrian testified that Kenneth explained the "guy" had tested it and gave it back saying, " 'What the hell is this?' " "[T]he guy" then reached for something and both Kenneth and Jesse told

---

[6] Adrian testified about things he claimed Jesse and Kenneth had told him about the evening Ryan died. Adrian testified that, after he found out that he was facing over 16 years in prison for an armed robbery (unrelated to this case), he agreed to testify about statements Jesse and Kenneth had made to him over a year earlier, in exchange for which Adrian would serve no actual jail or prison time for the armed robbery charges he was facing.

[7] Jesse's brother and mother testified that Jesse was at school that day.

him to stop. Jesse got nervous and shot the guy in "the head." When asked at trial whether Kenneth said anything to Adrian "about whether [Kenneth] was there during the time of the lick," Adrian responded, "Yes. . . . [H]e said he was . . . there pointing—pointing his gun [at Ryan]. A little—I can't—I don't know what kind of gun it was. I—a TEC-9—but he said—he said he was pointing the gun, too, right there on the side of [Jesse] and watching everything that was happening." Adrian later more unequivocally testified that Kenneth told him that Kenneth "was right there at the scene with Jesse . . . [¶] . . . [¶] . . .[and] that [Kenneth] had his gun pointed, too, at the people."

### b. *Bradley's statements*

The prosecution presented testimony regarding statements Kenneth made to his neighbor and friend Bradley. Because Bradley ultimately refused to testify,[8] his statements were testified to by police investigator Bruce Moore (the investigator), and Bradley's live-in girlfriend, Lea Martin.

#### i. *The investigator's testimony relaying Bradley's statements*

The investigator testified at trial that Bradley told him the following: Approximately two weeks after Ryan's death, Kenneth told him that he (Kenneth) had been involved in a homicide and had smoked in the area of the crime scene, possibly leaving a cigarette butt. Kenneth stated he was worried that he would be going away for a long time because the cigarette butt might contain his DNA. Kenneth also told Bradley that Kenneth felt

---

[8] The evidence presented at trial supported that Wayne and Jesse had intimidated and threatened Bradley and that Bradley feared retribution if he testified.

he had given Jesse the wrong gun, a .38, and wished he had given Jesse a "TEC-9 or MAC-10 or Glock 19," because if he had, "this" would not have happened. Kenneth said that he was armed with a MAC-10 when Jesse shot Ryan. Bradley had been to Kenneth's house and had seen a TEC-9, MAC-10, Glock 19, and shotguns. Bradley and Kenneth were both using methamphetamine at Bradley's house when Kenneth made these statements to Bradley.

### ii. *Lea's testimony conveying Bradley's statements*

Lea testified as follows regarding Bradley's statements to her: Early one morning in February 2015, she had found Bradley "quite zoned [out]" and "completely terrified" in their garage. Bradley stated to Lea that Kenneth had told him about "some sort of drug deal gone wrong" and that Kenneth "was sitting next to the kid when it had happened" and "after the initial death of the kid, they had parted ways," which she understood to mean they walked off in different directions. Kenneth told Bradley he was worried that he would be caught because he may have left a cigarette butt behind at the crime scene.

### c. *Raul's testimony*

Raul Barazza testified that while he was in juvenile hall with Jesse, Jesse told Raul that Jesse was in for murder because he was "gonna do a lick." "He was trying to rob somebody, but then it went wrong[,] so he shot him." Raul testified that Jesse said, "They [the victims] wanted to buy some [cocaine], but I guess the guy didn't want to give them nothing; so he shot him." Raul further testified that Jesse said he had done the "lick" with a "friend[ ]," and that the friend was "[b]ehind him" during the "transaction."

11

Raul admitted he had agreed to testify because the prosecutor promised him a substantially reduced sentence in connection with three counts of robbery unrelated to Jesse's case. He also was an informant in multiple other cases.

### d. *Jesse's statements to his mother*

The prosecutor played recorded jail calls Jesse made to his mother on February 9, 2015. In one, Jesse states, "You know I wish I never did this." In another call recorded later that day, Jesse's mother asks him, "You're saying there was Kenny near you?" and Jesse answers, "Yeah." She then asks, "And then how did you separate from Kenny?", to which Jesse responds, "Mom, I can't talk about it."

### 3. *Evidence Regarding Unrelated Subsequent Robbery*

Over Kenneth's objection, the court admitted evidence of Kenneth's involvement in the robbery of Donald "Ian" Moore (the Ian robbery) on the basis that it was relevant under Evidence Code section 1101 to prove Kenneth's intent to permanently deprive Ryan of his property.

Ian testified that he invited Kenneth to his house to smoke methamphetamine with him. At that time, Ian had been using methamphetamine daily for two years. At Kenneth's request, Ian opened the garage door to let Wayne in.

Ian then heard banging from inside his house. He went into his father's room to investigate and saw Wayne in the closet. Kenneth entered the room and told Ian not to fight, they just wanted the money and the guns. Kenneth forced Ian to sit on the bed and said, " 'Why shouldn't I just kill you right now. You are going to snitch.' " Wayne told Ian to put his face in a pillow and not to look. Wayne and Kenneth broke a wall to remove a safe

12

from the closet, then took the safe, guns, a suitcase full of various items, and Ian's cell phone and left.

Additional details about the Ian robbery came through Adrian's testimony and the investigator's testimony. Adrian testified that Kenneth told him that he had robbed Ian. The investigator testified that Bradley told him he lived across the street from Ian's house and had seen Kenneth in Ian's garage with a hatchet in his hand. Moments later, Bradley saw Kenneth and Wayne run up the street with a safe in a trash can.

### D.    Jury Verdict

The jury found both defendants guilty as charged. For the murder count, the court sentenced Jesse to 25-years-to-life and Kenneth to life without the possibility of parole (LWOP). Pursuant to section 654, the court stayed both defendants' respective sentences for the attempted robbery counts and the firearm enhancements.

The court ordered Kenneth to pay $1,794 in restitution, and ordered Jesse to pay restitution in an amount to be determined. The court awarded Jesse credit for 2,093 actual days spent in presentence custody, but did not award Kenneth any presentence custody credit.

Kenneth and Jesse each timely appealed.

### DISCUSSION

### A.    Jesse's Request for a New Juvenile Court Transfer Hearing

Pursuant to the Public Safety and Rehabilitation Act of 2016 (Proposition 57), effective January 1, 2018, prosecutors may not charge juveniles directly in adult criminal court; they must instead first commence an action in juvenile court, but the juvenile court may transfer the case to adult criminal court

13

if the prosecutor makes the required showing. (See *People v. Garcia* (2018) 30 Cal.App.5th 316, 323.) In order "[t]o justify the transfer of a minor from juvenile court to the criminal court system, the prosecution [is required to] establish[ ] . . . the minor is not a suitable candidate for treatment under the juvenile court system." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715; Welf. & Inst. Code, § 707, subd. (a).) In 2017, when the juvenile court transferred Jesse's case to adult criminal court, the prosecutor's burden was by a preponderance of the evidence. (See *J.N. v. Superior Court, supra*, at p. 715.) Effective January 2023, however, Assembly Bill No. 2361, changed that standard of proof and now requires "clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Stats 2022, ch. 330, § 1, approved Sept. 15, 2022, eff. Jan. 1, 2023.)

Citing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), Jesse argues this new standard applies retroactively to him, as the judgment against him is not yet final, and that we must therefore conditionally reverse the judgment against him and instruct the juvenile court to conduct a new juvenile court transfer hearing under the law as revised by Assembly Bill No. 2361. We agree.

In *Estrada*, the California Supreme Court held that, absent evidence of a contrary legislative intent, an amendment to a statute that reduces the punishment for a crime applies retroactively to any case in which the judgment is not final before the amendment's operative date. (*Estrada, supra*, 63 Cal.2d at p. 742.) In *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, the high court concluded that *Estrada*'s rationale applied to Proposition 57. (*Lara, supra*, 4 Cal.5th at pp. 303−304.) The court reasoned that although Proposition 57 did not reduce punishment, it provided "[t]he possibility of being treated as

14

a juvenile in juvenile court—where rehabilitation is the goal— rather than being tried and sentenced as an adult[, which] can result in dramatically different and more lenient treatment." (*Lara*, *supra*, at p. 303.) It therefore "reduce[d] the possible punishment for a class of persons, namely juveniles." (*Ibid*.) Thus, the court concluded that Proposition 57 "applies [retroactively] to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Lara, supra,* 4 Cal.5th at p. 304.)

*Estrada*'s rationale similarly applies to Assembly Bill No. 2361 and mandates retroactive application of the bill to judgments not yet final when it went into effect. Like Proposition 57, Assembly Bill No. 2361 does not reduce the punishment for a crime, but does increase the likelihood of a lesser punishment. Specifically, the bill heightens the prosecution's burden of proof when seeking to transfer a juvenile defendant to adult court, thereby increasing the possibility he or she will be tried before a juvenile court and, accordingly, also increasing the likelihood that he or she will receive a lesser, more rehabilitation-focused punishment than the juvenile defendant would have received in adult criminal court. We therefore conclude Assembly Bill No. 2361's changes to Welfare and Institutions Code section 707 apply retroactively to juveniles transferred to adult court whose judgment was not yet final by the time the new law went into effect on January 1, 2023. This includes Jesse, because the judgment against him could not be final until after that date.

If the juvenile court determines that transfer to adult criminal court is appropriate under the new standard of proof, the juvenile court shall transfer the matter back to adult criminal court, where the judgment against Jesse shall be reinstated.

15

If, however, the juvenile court determines that transfer to adult criminal court is not warranted, our conditional reversal shall automatically cease to be conditional, and the juvenile court shall conduct all further proceedings to adjudicate the charges against Jesse.[9]

### B.    Jesse's Prosecutorial Misconduct Claim

Jesse argues that, in her closing argument, the prosecutor made "a prolonged set of disparaging remarks about what she anticipated the defense would argue," and that this constituted prejudicial prosecutorial misconduct that denied Jesse a fair trial and warrants reversal of his conviction.

Prosecutorial misconduct requires " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp* (1999) 20 Cal.4th 826, 858.) Courts have recognized that personal attacks on the integrity of trial counsel can constitute deceptive or reprehensible methods of persuasion. (See *People v. Shazier* (2014) 60 Cal.4th 109, 150 [" ' "[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel" ' "].) Jesse argues that the prosecutor's closing argument included a personal attack on the integrity of Jesse's trial counsel and was thus misconduct. We disagree.

Jesse bases his argument on the following portion of the prosecutor's closing argument: "The defense in this case. Smoke

---

[9] Because, depending on the outcome of the juvenile court transfer hearing, it is possible that the judgment against Jesse will be reinstated, we address the remainder of the arguments he raises on appeal. By doing so, we do not mean to imply any view on the correct or likely outcome of the juvenile court transfer hearing.

16

and mirrors. You are going to hear about drug users. You are going to hear a whole bunch of names. And it is meant to distract. Okay? Look at all of it. Do not automatically accept. Do not automatically reject. You determine the credibility of each witness. You determine the importance, the weight. Their job is to minimize and confuse the true nature of the defendants' conduct. Don't lose sight of the totality of the evidence. All of it. Look and consider and evaluate all of it. Don't let the defense confuse you. The witnesses are—for argument purposes in their opinion—liars, drug users, and felons. Okay? But these liars, drug users, felons—don't forget about the jail calls. Don't forget about the surveillance, the text messages, the ballistic findings, the scene. It is the totality of the testimony and the totality of the circumstances."

Neither Kenneth nor Jesse's trial counsel objected to these remarks.[10] Rather, when Jesse's trial counsel began his closing argument, he immediately responded to the remarks by stating to the jury, "Well, are you ready to be misled and confused with smoke and mirrors? I hope—I am warning you; so be ready. Like a magician."

Closing argument " ' "may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' "

---

[10] The Attorney General argues that Jesse has forfeited his prosecutorial misconduct argument by failure to object below. Jesse counters that we should consider his argument for the first time on appeal, because of the fundamental nature of the right at stake and, in the alternative, because his trial counsel's failure to object constitutes ineffective assistance of counsel. We exercise our discretion to reach the merits of Jesse's argument and thus do not resolve the forfeiture or ineffective assistance issues.

(*People v. Williams* (1997) 16 Cal.4th 153, 221.) Indeed, attacks on counsel's credibility are improper in large part because they " 'risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 484.) Taken in context, the statements Jesse identifies are comments on the evidence that suggest inferences the jury could draw therefrom.

Courts have reached similar conclusions when considering similar comments. In *People v. Cummings* (1993) 4 Cal.4th 1233, for example, the California Supreme Court concluded that argument in which the prosecutor "accused the defense of attempting to hide the truth, and used [an] 'ink from the octopus' metaphor several times during closing argument, the context was such that the jury certainly would understand it to be nothing more than urging the jury not to be misled by defense evidence." (*Id.* at p. 1302.) Similarly, in *People v. Marquez* (1992) 1 Cal.4th 553, our state's high court considered a prosecutor's comments that a " 'heavy, heavy smokescreen . . . has been laid down [by the defense] to hide the truth from you,' " and concluded these reflected proper argument in response to the defense presented. (*Id.* at p. 575; see also, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1002 [no reasonable likelihood the jury was improperly influenced by prosecutor's remarks that defense counsel's "job is to create straw men . . . to put up smoke, red herrings" and that "[the prosecutor's] job is to straighten that out and show you where the truth lies"].)

As in these cases, the comments Jesse challenges would be understood by a reasonable jury as commentary on the evidence, rather than irrelevant personal insults. There was no misconduct.

18

### C. Substantial Evidence Supports That Kenneth Acted with Reckless Indifference to Human Life

Felony murder is a murder that "is committed in the perpetration of, or attempt to perpetrate" one of enumerated felonies, including robbery. (§ 189, subd. (a).) "A participant in the perpetration or attempted perpetration of [such] a felony . . . in which a death occurs is liable for murder only if" the prosecution also proves one of the following: "[t]he person was the actual killer," "[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree" or "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) At trial, the prosecutor proceeded on a theory that Kenneth was guilty of felony murder because he was a major participant in an attempted felony (robbery) who acted with reckless indifference to human life. On appeal, Kenneth challenges only the finding that he acted with reckless indifference to human life—not that he was a major participant in the underlying attempted robbery.

Reckless indifference encompasses a willingness to assist another in killing to achieve a particular goal, even if the victim's death was not specifically intended. (See *People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*) [reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions"].) "This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious

19

disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid*.)

In *Clark, supra,* 63 Cal.4th 522, the California Supreme Court identified circumstances that may be considered in determining whether a non-shooter aider and abettor to a felony acted with reckless indifference for human life. These are: (1) the "defendant's awareness that a gun will be used in the felony," the number of guns used, and/or the "defendant's use of a firearm, even if the defendant does not kill the victim" (*id*. at p. 618, italics omitted), (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim" (*id*. at p. 619, capitalization & italics omitted), (3) the "duration of the felony" (*id*. at p. 620, capitalization & italics omitted), (4) the "defendant's knowledge of [the] cohort's likelihood of killing" (*id*. at p. 621, capitalization & italics omitted), and (5) the "defendant's efforts to minimize the risks of the violence during the felony." (*Ibid*., capitalization & italics omitted); see *id*. at pp. 618−621 [adopting these factors as initially set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)].) " '[Not] one of these considerations is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Clark, supra,* at p. 618.)

We review challenges to the sufficiency of the evidence for substantial evidence, meaning we determine, based on the "entire record[,] whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable

20

doubt[,] . . . consider[ing] the evidence in a light most favorable to the judgment."  (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

Kenneth argues that Adrian's testimony and Bradley's statements—the only evidence supporting that Kenneth was present at the scene of the killing and in a position to facilitate or prevent the actual murder (the proximity factor) and the only evidence that Kenneth himself was armed—is not "reasonable, credible, and of solid value" and thus cannot constitute part of the substantial evidence supporting a finding of reckless indifference.  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.)  To support this argument, he points to contrary testimony of the only percipient witness (Dylan); Adrian and Bradley's lack of credibility as felons, drug users with impaired memories, and/or jailhouse informants; inaccuracies in their statements; inconsistencies in their statements over time; and an inherent implausibility of their version of events.

Kenneth's argument ignores the scope of our role in reviewing for substantial evidence.  "If there is conflicting testimony, we must accept the [trier of fact's] resolution of disputed facts and inferences, . . . and the version of events most favorable to the [judgment], to the extent the record supports them."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 342; *Peradotto v. State Personnel Board* (1972) 25 Cal.App.3d 30, 33 [substantial evidence review " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which supports the conclusion reached, disregarding any evidence in the record contrary to the trier's finding' "].)  Thus, inconsistencies between Dylan's testimony and Adrian's testimony or Bradley's statements are not a basis on which we may reject the latter.  Nor is anything "so inherently implausible about [Adrian's testimony and

21

Bradley's statements] to justify disregarding [them] under the substantial evidence rule." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 254; see also *People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1059 [the court had "no doubt that a defendant's story (his version of the events in question) constitutes substantial evidence, in and of itself, even if the story is implausible and seriously contradicted by other evidence"].) Likewise, we may not reject this evidence because Adrian and Bradley each had a strong motive to lie. (See *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 ["testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"]; see also Evid. Code, § 780.) We thus consider Adrian's and Bradley's statements as a source of evidence in assessing the sufficiency of the evidence under the *Clark* factors.

As to the first *Clark* factor, "[a] defendant's use of a firearm, even if the defendant does not kill the victim . . . , can be significant to the analysis of reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618.) Here, Adrian's testimony supports that Kenneth supplied the murder weapon to Jesse, and the jury could reasonably infer that Kenneth gave it to him loaded. Adrian, Lea, and the investigator's testimony also supports both that Kenneth was armed during the robbery and a reasonable inference that Kenneth's weapon was loaded. Introducing loaded weapons into a robbery substantially increases the risk that the robbery will end in lethal violence— simply put, "[e]veryone knows the main purpose of a loaded gun is to hurt people." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 10; see *ibid.* [use of a loaded gun and lack of efforts to mitigate

attendant risk of harm supported reckless indifferences, because "[the defendant's] plan was a gun plan. . . . He gave [a loaded gun] to [the shooter] but made no effort to unload it or to caution [the shooter] about restraining his conduct" or to otherwise plan the crime in a manner to minimize the risk of harm].)

Another consideration is the proximity of the defendant to the killing. (*Clark, supra*, 63 Cal.4th at p. 619.) A defendant's presence close to the shooting " 'gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Ibid.*) Here, the jury could reasonably infer from the testimony that Kenneth was standing next to Jesse at the time of the shooting. The record does not suggest that Kenneth made any effort to restrain Jesse from returning to the car after Ryan refused the fake drugs, or to restrain Jesse from shooting Ryan once Jesse had returned to the car. Moreover, Kenneth's proximity to Jesse—particularly when combined with Kenneth being armed—also increases the likelihood that Jesse might use potentially lethal force to achieve the ends of the robbery. There is strength in numbers; all else being equal, a man who knows he has an armed compatriot beside him is more likely to feel emboldened to use his weapon. A reasonable person in Kenneth's position would understand that his armed presence next to Jesse at the scene could embolden Jesse to use his own gun, and thus increase the likelihood of lethal violence beyond that inherent in any armed robbery. As a corollary to proximity, courts also consider a defendant's efforts to assist the victim. Nothing in the record suggests Kenneth attempted to assist Ryan after Jesse shot him.

We also consider whether a defendant attempts to minimize the risks of violence during the robbery. (*Clark,*

23

*supra*, 63 Cal.4th at pp. 621–622.)  Here, the evidence supports that Kenneth helped plan the robbery at a location in front of a vacant home after dark and using two guns—a plan that increased, rather than reduced, the likelihood of lethal violence. By contrast, in *Clark*, the defendant planned the robbery to occur at a time when most of the employees would be gone, the gun used in the robbery was supposed to be unloaded, and the gun recovered after the shooting had only been loaded with one bullet.  (*Ibid*.)  The record does not support that any similar circumstances were present here.

Considering the record as a whole, we conclude that the jury could reasonably infer that Kenneth acted with reckless indifference to human life.

None of the cases Kenneth cites in which evidence of reckless indifference was found insufficient involves a defendant who was himself armed and in close proximity to the killing when it occurred.  (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1090 ["[t]he defendants who have shown their culpability was too slight under *Banks* and *Clark* 'are those who were not wielding guns themselves and also not present for the shooting' "].)  In *In re Scoggins* (2020) 9 Cal.5th 667, for example, the defendant "did not use a gun, nor did he know that a gun would be used during the felony" (*id.* at p. 677) and he "did not arrive at the crime scene until after the shooting occurred."  (*Id.* at p. 678.) In *In re Taylor* (2019) 34 Cal.App.5th 543, the defendant was waiting in the car during the planned robbery (*id.* at p. 559) and "did not supply [the shooter] with the murder weapon[,]. . . [n]or did [the defendant] have or use his own weapon during the crime.  Thus, . . . there [was] little about [the defendant's] use or knowledge of firearms that suggest[ed] he appreciated the planned robbery posed a heightened risk of death."  (*Id.* at

24

pp. 557–558.) The other cases on which Kenneth relies are similarly distinguishable. (See *Banks, supra*, 61 Cal.4th at p. 805 [defendant was not armed, had no role in procuring arms for others, and "[d]uring the robbery and murder, . . . was absent from the scene, sitting in a car and waiting"]; *Clark, supra*, 63 Cal.4th at p. 619 [defendant not armed and was waiting across the parking lot from the store where his cohort shot the victim]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [defendant was not himself armed and "was not at the immediate location of the killing"].)

Finally, Kenneth argues that his youth should be considered in determining whether he acted with reckless disregard for human life. He cites sentencing cases and statutes that contain or imply "the observation that recklessness is one of the distinctive attributes of youth." But even a 20-year-old can understand that two armed individuals attempting to trick someone into buying fake drugs on a dark, empty street involves a high risk of someone getting shot and killed. And the defense did not present evidence suggesting that anything about Kenneth at age 20 or his childhood rendered him generally less capable of appreciating the risk of death in such a situation.[11]

---

[11] To this extent, the recent decision of the First District Court of Appeal considering the age of a young adult in assessing reckless disregard for human life is distinguishable. (See *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091 ["the record of conviction included a report provided by the defense for the sentencing hearing pursuant to . . . *Franklin*[, *supra*,] 63 Cal.4th 261 . . . and section 3015 . . . assert[ing] that he had a traumatic and violent upbringing, had suffered from under-diagnosed mental health issues and drug abuse, witnessed his first murder at age 10, had become numb to violence, was

## D. Admission of Evidence Regarding the Ian Robbery

Kenneth challenges the admission of evidence regarding the Ian robbery, arguing that the court abused its discretion in permitting the evidence. Specifically, he argues that the evidence was not admissible under Evidence Code section 1101, subdivision (b), which establishes an exception to the general rule that character evidence is inadmissible to prove a defendant's conduct on a specific occasion, and that even if it was admissible under that section, the court should have excluded it under Evidence Code section 352. We need not decide whether he is correct, because even if the court erred in admitting the evidence, any such error was not prejudicial.

Kenneth first urges that the admission of this evidence was so prejudicial, it denied him a fair trial, requiring reversal unless the state "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) To establish prejudice on this ground, the error must " 'render[ ] the trial so arbitrary and fundamentally unfair that it violated federal due process.' " (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) "[F]ailure to comply with the state's rules of evidence is [not] . . . a sufficient basis for" establishing such fundamental unfairness. (*Id.* at p. 919.) Kenneth simply has not established that the effects of the Ian robbery evidence permeated and tainted the entire trial to such an extent that the trial was

---

vulnerable to increased aggression, and appeared to be impulsive rather than criminally sophisticated"].) To the extent that case stands for the proposition that being 20 years old is a factor that inherently weighs against a finding of reckless indifference, we disagree.

arbitrary and fundamentally unfair.  Therefore, *Chapman* does not provide the appropriate standard for our harmless error analysis.

Rather, in assessing prejudice from any error in admitting the Ian robbery evidence, we apply *People v. Watson* (1956) 46 Cal.2d 818, and consider whether it is reasonably probable that, had the jury not heard the Ian robbery evidence, the jury would have entered a verdict more favorable to Kenneth.  (See *id.* at p. 836.)

Kenneth takes the position that such a reasonable likelihood exists, first arguing that "[t]his highly inflammatory evidence would have obviated any concerns the juror[s] would have had about Adrian's compromised credibility as well as the credibility of other witnesses," namely Raul and Bradley.  Kenneth impeached the credibility of these individuals at trial based on their being felons, drug addicts, and/or themselves criminal defendants with a self-serving motive to provide helpful testimony to the prosecution.  But the fact that Kenneth committed felonies and used drugs as set forth in the Ian robbery evidence cannot rehabilitate a witness following such impeachment; indeed, such evidence has no logical bearing on the credibility of the prosecution's witnesses at all.  And Kenneth did not offer testimony contradicting Adrian's, Bradley's, or Raul's respective versions of events, so Kenneth's credibility relative to that of others is not at issue.

Kenneth also contends that admission of this evidence was prejudicial in that it "allowed the jurors to prejudge Kenneth and conclude that, because of his criminal propensity and bad character, he had to have committed the felony[ ]murder, even though Adrian and Bradley's credibility was doubtful and their statements were inconsistent, unreliable, and too convenient for

27

the prosecution."  But the jury was instructed "not [to] consider [the Ian robbery evidence] for any other purpose except for the limited purpose of intent to deprive the owner of the property permanently" and "not [to] conclude from this evidence that the defendant has a bad character or is disposed to commit a crime." "When, as here, there are no indications to the contrary, we assume that the jurors followed the trial court's instructions" and did not, based solely on their viewing Kenneth as a generally bad person who commits crimes, find him guilty of murder without supporting evidence.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1413.)

In arguing to the contrary, Kenneth describes the prosecution's murder case against Kenneth as weak, a description based primarily on his characterization of Adrian, Bradley, and Raul as unreliable witnesses.  Kenneth's efforts to find inconsistencies in these witnesses' statements notwithstanding, many aspects of their statements were either uncontradicted or corroborated by other evidence, such that any credibility concerns have a more limited effect on the strength of the prosecution's case.  Still, Adrian's, Bradley's, and Raul's respective statements *do* conflict with other evidence on two key points:  Kenneth's proximity to Jesse at the time of the shooting and Kenneth's use of a firearm, both of which are crucial to the reckless indifference analysis.  But this conflicting evidence does not assist Kenneth in establishing prejudice from the admission of the Ian robbery evidence.  First, even assuming the jury ignored the limiting instruction and inferred Kenneth had a general propensity to commit crimes, a general criminal propensity does not make it more likely that one will participate in a crime *in a specific way*—namely, by using a gun, or by brandishing a gun himself during a shooting, which by all

28

accounts, was unplanned. Second, the Ian robbery evidence does not support more specific propensity inferences, such as a propensity to use firearms. The Ian robbery did not involve firearms. It is thus not reasonably likely that the Ian robbery evidence caused the jury to make improper propensity inferences that allowed them to more easily believe the key testimony from the witnesses Kenneth identifies. Thus, even assuming the court incorrectly admitted the Ian robbery evidence under Evidence Code section 1101 and/or Evidence Code section 352, Kenneth has not established *Watson* prejudice from any such error.

### E.    Constitutional Arguments

Kenneth raises several constitutional challenges to the statutes under which he was sentenced (§§ 190.2, 190.5), the statute deeming him ineligible for a youth offender parole hearing (§ 3051), and the imposition of a LWOP sentence in his case.[12] Jesse also challenges section 190.5 as imposing cruel and unusual punishment.

#### 1.    *Kenneth's Equal Protection Arguments*

As a preliminary matter, Kenneth's equal protection arguments distinguish between those who committed crimes while under 18 years, and those who committed crimes between the ages of 18 and 25 years, a period during which, according to relatively recent neurological research Kenneth cites, the brain is still developing, in particular the portions responsible for

---

[12] The state argues that Kenneth has forfeited his constitutional arguments by failing to raise them below. We exercise our discretion to consider Kenneth's equal protection argument and, based on the outcome of that analysis, need not reach his cruel and unusual punishment arguments.

" 'executive functions' " like foreseeing and weighing potential consequences and moderating " 'correct' " and risk-taking behavior.  For ease of reference, we shall refer to those under 18 years as "juveniles" and to those between the ages of 18 and 26 years as "young adults."

Kenneth first challenges the constitutionality of the sections under which he was sentenced to LWOP (§§ 190.2, 190.5), arguing that their "retention of mandatory LWOPs for [young adult] offenders [who commit special circumstances murder] . . . deprives such offenders of equal protection."  He also challenges section 3051, the statute addressing eligibility for a youth offender parole hearing (a challenge we discuss below), as violating constitutional equal protection guarantees.

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253, italics omitted.)  "Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference.  [Citation.]  '[E]qual protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' [Citation.]" (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195–196 (*Edwards*).)

30

### a. *Sentencing statutes*

Taken together, sections 190.2 and 190.5 create a mandatory LWOP sentence for those who commit first degree special circumstances murder as a young adult, but not for those who commit the offense as juveniles.  (See §§ 190.2, subd. (a), 190.5, subd. (b).)  Kenneth argues that there is no constitutionally justifiable basis for the law to distinguish these two similarly situated groups because, based on the scientific research Kenneth cites, both groups " 'have a diminished culpability and greater prospects for reform.' "

The Supreme Court has "held on multiple occasions that a sentencing rule permissible for adults may not be so for children."  (*Miller v. Alabama* (2012) 567 U.S. 460, 481 (*Miller*).)  Courts of Appeal have rejected equal protection challenges to the disparate treatment of young adult LWOP offenders and juvenile LWOP offenders under other laws, concluding that, even if these two groups are similarly situated, such disparate treatment is constitutionally justifiable.  (See *People v. Sands* (2021) 70 Cal.App.5th 193, 204 (*Sands*), review den. Dec. 22, 2021, S271797 [addressing equal protection challenge to section 3051]; *In re Jones* (2019) 42 Cal.App.5th 477, 481 (*Jones*) [addressing equal protection challenge to section 1170, subdivision (d), which entitles certain offenders convicted of crimes they committed as juveniles to submit a petition for resentencing].)  We find this same reasoning persuasive here.  In drafting section 190.5, the Legislature had a rational basis for distinguishing between offenders who commit the same crime "based on their age.  For juvenile offenders, [an LWOP] sentence may violate the Eighth Amendment.  (*Graham v. Florida* [(2010) 560 U.S. 48, 75 (*Graham*)]; *Miller, supra*, 567 U.S. at p. 479.)  But the same sentence does not violate the Eighth Amendment

31

when imposed on an adult, even an adult under the age of 26. ([*People v.*] *Morales* [(2021)] 67 Cal.App.5th [326,] 347.) . . . [T]he Legislature could rationally decide to remedy unconstitutional sentences but go no further," and thus could rationally choose to exempt only juveniles, not young adults, from an otherwise mandatory LWOP sentence. (*Sands, supra*, 70 Cal.App.5th at p. 204, review den.) Moreover, the Legislature could have reasonably concluded that punishing adults—young or not— more harshly than legal children (juveniles) engaging in the same conduct was best for the public good, any neurological similarities between the two types of offenders notwithstanding. "[A] line must be drawn somewhere[ ] [citation] . . . [citations] . . . [t]he Legislature could reasonably decide that for those convicted of LWOP crimes, the line should be drawn at age 18, rather than at some later date when the brain is fully developed." (*Jones, supra*, 42 Cal.App.5th at pp. 482−483.) "Drawing a bright line at age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes. While a different line could have been drawn, it is not entirely arbitrary to limit" section 190.5's exception to mandatory LWOP sentencing to those who committed first degree special circumstances murder before they were 18 years old. (*Jones, supra*, at p. 483.)

### b. *Youth offender parole hearing statute*

We next consider Kenneth's equal protection challenges to the youth offender parole hearing statute, section 3051.

Section 3051 requires that an offender convicted of a crime he or she committed before the age of 26 receive a "youth offender

32

parole hearing" after a certain period of incarceration.[13]  (§ 3051, subd. (b).)  The requirement for such a hearing does not apply, however, to, inter alia, "cases in which an individual is sentenced to [LWOP] for a controlling offense that was committed after the person had attained 18 years of age," as here.  (§ 3051, subd. (h).)

At such a hearing, the reviewing board is to "give great weight to . . . the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner."  (§ 4801, subd. (c); see *Franklin, supra*, 63 Cal.4th at p. 283.)  Such hearings are intended " 'to give youthful offenders "a meaningful opportunity to obtain release" after [a certain amount of time] in prison (§ 3051, subd. (e)) and . . . " 'a showing of rehabilitation and maturity' " ' and 'to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s.' [Citation]." (*People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1166.)

Kenneth challenges the constitutionality of section 3051 in two ways.  First, he argues it guarantees *juveniles* who commit LWOP offenses an opportunity to obtain release on parole,  but denies such an opportunity to *young adults* who commit LWOP offenses.  This argument fails for the same reasons Kenneth's challenge to the sentencing statutes fails:  even assuming the two groups he identifies are similarly situated, the Legislature is constitutionally justified in treating them differently.  (See, e.g., *People v. Hardin* (2022) 84 Cal.App.5th 273, 285 (*Hardin*),

<hr />

[13] An earlier version of section 3051 only required youth offender parole hearings for juveniles.  In 2018, the Legislature amended it to provide this benefit to young adults under certain circumstances, as outlined above.

review granted Jan. 11, 2023, S277487 ["[d]istinguishing between juvenile and young adult offenders sentenced to life without parole does not violate equal protection," italics omitted].)

Kenneth's second argument is more persuasive: It is a violation of equal protection for section 3051 to deny a youth offender parole hearing for defendants convicted of LWOP offenses they committed as young adults, but grant such a hearing to an offender *of the same age* who receives a de facto LWOP sentence—that is, one comprised of sentences for multiple non-LWOP crimes that result in a required period of incarceration that is longer than the offender's natural life. (See *People v. Caballero* (2012) 55 Cal.4th 262, 271–272 (conc. opn. of Werdegar, J.) ["the purported distinction [proposed by the Attorney General] between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive"].)

We must first consider whether the two groups identified "are properly distinguishable for purposes of the law being challenged, even if they are dissimilar for other (or even most) purposes." (*Hardin, supra*, 84 Cal.App.5th at p. 287, review granted.) There is disagreement among various Courts of Appeal as to whether the young adult LWOP offenders and young adults convicted of de facto life sentences are similarly situated for the purposes of section 3051. (Compare, e.g., *People v. Acosta* (2021) 60 Cal.App.5th 769, 779 (*Acosta*) [similarly situated] and *People v. Jackson* (2021) 61 Cal.App.5th 189, 199 [not similarly situated].) Based upon our analysis of the purpose of section 3051 as set forth below, we agree with those courts concluding that these two groups are similarly situated for purposes of section 3051.

34

" '[T]he purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison.' " (*Acosta, supra,* 60 Cal.App.5th at p. 779; accord, *Hardin, supra,* 84 Cal.App.5th at p. 287, review granted ["Section 3051 is decidedly not a sentencing statute. . . . [I]ts purpose [is] not to assess culpability or measure the appropriate level of punishment for various crimes."].)  Section 3501 seeks "to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20's" (*Edwards, supra,* 34 Cal.App.5th at p. 198) and to provide an opportunity to consider " 'youthful offenders' greater potential for rehabilitation and maturation.' " (*Sands, supra,* 70 Cal.App.5th at p. 203, review den.)

"Viewed in light of section 3051's intended purpose of permitting a determination whether a person who committed a serious or violent crime [as a juvenile or young adult] has sufficiently matured and outgrown the youthful impulses that led to the commission of the offense," young adults who commit multiple crimes resulting in a de facto life sentence are similarly situated to young adults who commit a single crime mandating an LWOP sentence.  (*Hardin, supra,* 84 Cal.App.5th at p. 287, review granted ["an individual serving a parole-eligible life sentence and a person who committed an offense at the same age serving a sentence of [LWOP] are similarly situated"]; see also *In re Woods* (2021) 62 Cal.App.5th 740, 752–753, review granted June 16, 2021, S268740 (*Woods*) [young adult one-strike sex offenders similarly situated to young adult murderers for the

purposes of section 3051].) Young adults who have been deemed to have approximately the same level of culpability for their crimes, as measured by the de facto length of their sentences[14] "are similarly situated for the purpose of evaluating whether they have outgrown the youthful impulses that led to the commission of their offenses." (*Jones, supra*, 42 Cal.App.5th at p. 486 (conc. opn. of Pollak, P. J.).) "The legal and scientific foundations supporting the rationale that youths have diminished culpability, such as a youth's ' "lack of maturity and an underdeveloped sense of responsibility" ' (*Roper v. Simmons* (2005) 543 U.S. 551, 569 [(*Roper*)]), and the goal of calibrating punishment accordingly apply to both the youthful [offender convicted of an LWOP crime] and the youthful . . . offender [convicted of multiple crimes resulting in a de facto life sentence]. The corollary principle that the increased maturity that comes with age will reduce the likelihood of repeat offenses also applies to both groups of offenders. The related goal of motivating imprisoned youthful offenders to rehabilitate also applies equally to both categories of youthful offenders." (*Woods, supra*, at pp. 752−753.) "[O]ne could say that both groups committed their crimes before their prefrontal cortexes reached their full functional capacity, when their characters were not yet fully formed. Both groups

---

[14] Indeed, this court has previously concluded that young adults committing crimes with potentially different levels of culpability (as measured by the length of the sentence) may nevertheless be similarly situated for the purposes section 3051, given its focus on age-based capacity for change over time and the generally reduced culpability of young adults. (See *Woods, supra*, 62 Cal.App.5th at pp. 752–753 [young adult one-strike sex offenders similarly situated to young adult murders]; accord, *Edwards, supra*, 34 Cal.App.5th at pp. 195−196.)

36

are equally likely to demonstrate improved judgment and decisionmaking as they reach emotional and cognitive maturity." (*In re Williams* (2020) 57 Cal.App.5th 427, 435.)  For all these reasons, we conclude they are similarly situated for the purposes of section 3051.

Even among those courts concluding the two groups are similarly situated for the purposes of section 3051, there is at least some disagreement as to whether there is a constitutionally justifiable basis for granting a youth offender parole hearing to the members of one of these groups, but not the other. (Compare *Hardin, supra*, 84 Cal.App.5th at p. 288, review granted, and *In re Williams, supra,* 57 Cal.App.5th at p. 435; *Sands, supra,* 70 Cal.App.5th at p. 204, review den.)  We agree with the recent decision of Division Seven, in *Hardin*, concluding that no such constitutionally justifiable basis exists.  (*Hardin, supra*, at p. 288.)

The decisions reaching the opposite conclusion have typically done so citing as a rational basis for disparate treatment the disparate severity of the crimes leading to LWOP and non-LWOP sentences.  (See, e.g., *In re Williams, supra*, 57 Cal.App.5th at p. 436; *Acosta, supra*, 60 Cal.App.5th at p. 780; *Sands, supra*, 70 Cal.App.5th at p. 205, review den.)  We find this reasoning unpersuasive for the explanation articulated in *Hardin*.  "The crime of a 20-year-old offender who shot and killed his victim while attempting to commit robbery and was sentenced to [LWOP] (see § 190.2, subd. (a)(17)(A)) cannot rationally be considered more severe than those of a 20[-]year[-]old who shot and killed his victim one day, committed a robbery the next, and was sentenced to an indeterminate term of 50 years to life (see §§ 190, subd. (a), 12022.53, subd. (d)), or who committed multiple violent crimes . . . and received a parole-

37

eligible indeterminate life term that far exceeded his or her life expectancy.  By defining the youth parole eligible date in terms of a single 'controlling offense,' rather than by the offender's aggregate sentence, the Legislature has eschewed any attempt to assess the offenders' overall culpability, let alone his or her amenability to growth and maturity." (*Hardin, supra*, 84 Cal.App.5th at p. 289, fn. omitted, review granted.)  "The nature of their crimes does not provide any indication either perpetrator can properly be deemed at the time of sentencing to be 'irreparably corrupt, beyond redemption, and thus unfit ever to reenter society,' as the Supreme Court in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [(*Gutierrez*)], described the implied finding and necessary consequence of a life without parole sentence." (*Hardin*, *supra*, at p. 288.)

For these reasons, we agree with Kenneth that section 3051, subdivision (h) violates the equal protection clause in that there is no constitutionally justifiable basis for denying him, as a young adult convicted of LWOP-eligible first degree special circumstances murder, a youth offender parole hearing, whereas other similarly situated young adults are entitled to receive one.  Kenneth is therefore entitled to a youth offender parole hearing in the 25th year of his incarceration, the latest point at which an offender to whom the statute applies may receive such a hearing, and the point at which juveniles who commit LWOP offenses are eligible for such a hearing.  (See § 3051, subd. (b)(4).)

### 2. Cruel and Unusual Punishment Arguments

#### a. *Applicable legal principles*

The cruel and unusual punishments clause of the Eighth Amendment is directed, in part, " ' "against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." ' " (*Enmund v. Florida* (1982) 458 U.S. 782, 788.) The California Constitution likewise prohibits "[c]ruel or unusual punishment." (Cal. Const., art. I, § 17.)

The United States Supreme Court has held that imposing the death penalty on defendants for crimes they committed as juveniles violates the Eighth Amendment ban on cruel and unusual punishment. (*Roper, supra*, 543 U.S. at pp. 568−575.) The high court has also concluded an LWOP sentence is akin to the death penalty for an offender that committed the underlying crime as a juvenile. (*Miller, supra*, 567 U.S. at p. 475.) Therefore, in *Miller*, the United States Supreme Court held that an LWOP sentence for such juvenile offenders likewise constitutes cruel and unusual punishment. (*Id.* at pp. 476−477.) The Court's reasoning in this line of cases focuses in part on scientific research regarding the "fundamental differences between juvenile and adult minds" (*Graham, supra*, 560 U.S. at p. 68) and how the juvenile brain is still developing, as a result of which juveniles are "more capable of change than are adults." (*Ibid.*, citing *Roper, supra*, 543 U.S. at p. 570.)

#### b. *Jesse's cruel and unusual punishment argument*

Section 190.5, subdivision (b) provides that a defendant who was "under the age of 18 years at the time of the commission

of [special circumstances first degree murder], shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).) Jesse challenges section 190.5 as imposing cruel and unusual punishment in that it permits LWOP for defendants who were juveniles when they committed their crimes.

In *Gutierrez*, our Supreme Court found "no constitutional infirmity" in section 190.5 (*Gutierrez, supra*, 58 Cal.4th at p. 1361), construing it to give the court the discretion "to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of [LWOP]." (*Id*. at p. 1360.) Moreover, after the enactment of the youth offender parole hearing statute (§ 3051), in practical terms, there is no such thing as LWOP for a defendant who committed a crime as a juvenile, because section 3051 "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin, supra*, 63 Cal.4th at p. 281; *People v. Lozano* (2017) 16 Cal.App.5th 1286, 1292 (*Lozano*) ["[t]he Legislature has made the determination in [enacting section 3051] that" California juvenile homicide offenders will not "face a sentence that possibly runs afoul of the Eighth Amendment as interpreted in *Miller*"].)

Jesse acknowledges that this forecloses his constitutional challenge to section 190.5, but argues that his right to a section 3051's youth offender parole hearing may be taken away at any time by the Legislature or electorate, so his parole hearing is not guaranteed. Such an argument is speculative and fails. (See *Lozano, supra*, 16 Cal.App.5th at pp. 1290, 1292 [dismissing

appeal as moot because section 3051 provides a parole hearing, so defendant is no longer subject to an LWOP sentence].)

### c. *Kenneth's cruel and unusual punishment arguments*

We need not address Kenneth's arguments that a sentence of LWOP for a crime committed while the offender was a young adult constitutes categorical cruel and unusual punishment and/or that his LWOP sentence constitutes such constitutionally prohibited punishment because it is grossly disproportionate to the crime committed. Because Kenneth is entitled to a youth offender parole hearing in his 25th year of incarceration, he is effectively no longer sentenced to LWOP, and his challenges to such a sentence are therefore moot. (See *Lozano, supra*, 16 Cal.App.5th at pp. 1288−1289.)

### F. Kenneth's Custody Credits

We agree with both Kenneth and the Attorney General that Kenneth is entitled to presentence custody credits for the 1,340 days he spent in custody between his arrest and his sentencing.

Section 2900.5 provides that a defendant is entitled to have the time he spends in custody before he is sentenced credited toward his term of imprisonment. Such credit is distinct from credits an inmate may receive for good conduct or participation in certain rehabilitation or work programs while in custody. (See §§ 2933.05, 4019.) Section 2933.2, subdivision (a) precludes a person convicted of murder from accruing worktime and conduct credit between arrest and conviction but does not preclude such a person from receiving custody credits accrued during this time. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

The court did not award Kenneth any credit for the 1,340 days he spent in custody between his arrest and his

41

conviction. "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*People v. Taylor*, *supra*, 119 Cal.App.4th at p. 647.) Accordingly, the court is instructed on remand to award Kenneth 1,340 days of presentence custody credit.

### G.     Issues Related to Fees and Fines

#### 1.     *Jesse's Probation Report and Booking Fees*

The trial court imposed on Jesse a presentence probation report fee, up to $1,095, pursuant to section 1203.1b, and a booking fee of $514.58, pursuant to Government Code section 29550. Pursuant to recently enacted Assembly Bill No. 1869 (2019–2020 Reg. Sess.), those fees should be stricken.

#### 2.     *Joint and Several Liability for Restitution Order*

The court ordered Kenneth to pay $594 to reimburse the California Victim Compensation Board and $1,200 for Ryan's burial expenses. The court must order restitution in an amount sufficient to reimburse the victim "for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subd. (f)(3).) A trial court has authority to make the restitution obligation joint and several. (See, e.g., *People v. Neely* (2009) 176 Cal.App.4th 787, 800.) Because the goal of the victim restitution statute is "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime" (§ 1202.4, subd. (a)(1)), we agree with both Kenneth and the Attorney General that the victim in this case is entitled to collect restitution from all those convicted of Ryan's murder.

42

## DISPOSITION

The judgment against Jesse Cottom is conditionally reversed. The matter is remanded to the juvenile court to conduct a juvenile court transfer hearing regarding the charges against Jesse Cottom, consistent with Welfare and Institutions Code section 707, as amended by Assembly Bill No. 2361.

If the juvenile court determines that transferring Jesse Cottom's case to adult criminal court is not warranted, our conditional reversal shall automatically cease to be conditional, and the juvenile court shall conduct all further proceedings to adjudicate the charges against him.

If, however, the juvenile court determines that trying Jesse Cottom in adult criminal court is appropriate, the juvenile court shall transfer the matter back to adult criminal court, at which point: (1) our conditional reversal is no longer in effect, (2) the judgment against Jesse Cottom is modified to strike the probation and booking fees and add that Jesse Cottom is jointly and severally liable with Kenneth Wilson for the restitution Kenneth Wilson was ordered to pay, (3) the judgment, as so modified, is affirmed, and (4) the criminal court is instructed to amend the abstract of judgment in accordance with this disposition, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

Kenneth Wilson's convictions are affirmed, but the court shall modify the judgment against him in the following ways: (1) to add that Kenneth Wilson is entitled to a Penal Code section 3051 parole hearing in the 25th year of his incarceration, (2) to modify the order of restitution to be joint and several with any other defendant convicted of the murder of Ryan Sniffin, and (3) to grant Kenneth Wilson 1,340 days of custody credit.

43

As so modified, the judgment against Kenneth Wilson is affirmed. In addition, the criminal court is instructed to hold a hearing pursuant to *Franklin*, *supra*, 63 Cal.4th 261, to issue a judgment reflecting the modifications here required, to amend the abstract of judgment in accordance with this disposition, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

I concur:



CHANEY, J.


44

WEINGART, J., Concurring and Dissenting.

I join in the court's opinion except for that portion striking down Penal Code section 3051, subdivision (h)[1] on equal protection grounds because it denies a youth offender parole hearing to those sentenced to life in prison without the possibility of parole (LWOP) for a controlling offense committed between the ages of 18 and 25.

Defendant Kenneth Wilson[2] was convicted of first degree felony murder committed during an attempted robbery, during which he was also armed with a firearm. The penalty identified by the Legislature for such a murder involving special circumstances is more severe—death or LWOP—than most other types of murder. (E.g., compare § 190.2, subd. (a) with § 190.) Capital punishment is "limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.' " (*Roper v. Simmons* (2005) 543 U.S. 551, 568 [125 S.Ct. 1183, 161 L.Ed.2d 1].) After capital punishment, LWOP "is 'the second most severe penalty permitted by law.' [Citation.]" (*Graham v. Florida* (2010) 560 U.S. 48, 69 [130 S.Ct. 2011, 176 L.Ed.2d 825].)

A meritorious equal protection claim first must demonstrate that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*People v. Morales* (2016) 63 Cal.4th 399, 408.) In the

---

[1] All unspecified statutory references are to the Penal Code.

[2] As with the majority opinion, because multiple individuals involved in this case have the same surnames, I use Kenneth's name. No disrespect is intended.

equal protection context, similarly situated "means that the compared groups are ' "similarly situated for purposes of the law challenged." ' [Citation.]" (*In re C.B.* (2018) 6 Cal.5th 118, 134.) Section 3051 is a Penal Code statute, and generally persons convicted of different crimes are not similarly situated for equal protection purposes. (E.g., *In re Williams* (2020) 57 Cal.App.5th 427, 435; *People v. Descano* (2016) 245 Cal.App.4th 175, 181; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503.) That seems to me particularly true when the controlling offense at issue here results in either capital punishment or LWOP, sentences that in their severity share characteristics "that are shared by no other sentences." (*Graham v. Florida, supra*, 560 U.S. at p. 69.)

Following *People v. Hardin* (2022) 84 Cal.App.5th 273 (*Hardin*), review granted January 11, 2023, S277487, and the majority opinion in *In re Woods* (2021) 62 Cal.App.5th 740, review granted June 16, 2021, S268740, the majority cabins the purpose of section 3051 to "permitting a determination whether a person who committed a serious or violent crime [as a young adult] has sufficiently matured and outgrown the youthful impulses that led to the commission of the offense." (*Hardin, supra*, at p. 287.) If section 3051 can be so confined, then it follows that *all* young adult offenders are similarly situated regardless of their controlling offense—whether they committed an offense expressly excluded from relief under section 3051, subdivision (h) like a special circumstance murder, a third strike, or a sex crime in violation of section 667.61, or instead committed a much less serious offense. That is because the only thing that matters in the eyes of the majority is whether the defendant has matured since his or her crime was committed, and everyone ages.

2

I question, however, if that fairly reads the entire statutory purpose. Section 3051 does not solely provide a means to determine if individuals have matured. It also distinguishes between the types of offenses eligible for a youthful offender parole hearing (§ 3051, subd. (h)), and parses how many years of incarceration must be served before a hearing is held for those who are eligible based on the severity of their controlling offense (§ 3051, subd. (b)(1)-(3)), which suggests the Legislature had an additional purpose of "calibrat[ing] sentences in accordance with youthful offenders' diminished capability." (*In re Williams*, *supra*, 57 Cal.App.5th at p. 435.) The Penal Code is rife with such distinctions. Punishments vary from crime to crime, including the length of time one must serve before becoming eligible for parole, or whether there is even the possibility of parole. "A criminal defendant has no vested interest ' "in a specific term of imprisonment or in the designation a particular crime receives." ' [Citation.] It is both the prerogative and the duty of the Legislature to define degrees of culpability and punishment, and to distinguish between crimes in this regard. [Citation.] Courts routinely decline to intrude upon the 'broad discretion' such policy judgments entail." (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) Because in my view the type of controlling offense does matter and defendants convicted of crimes excluded from the reach of section 3051 are not similarly situated to other youthful offenders, Kenneth's equal protection argument fails.

Even if one assumes Kenneth is similarly situated to other young adult offenders eligible for relief under section 3051, I fail to see how section 3051, subdivision (h) flunks the rational basis test. That test is a deferential one. Section 3051's disparate

3

treatment of arguably similarly situated individuals "satisfies the rational basis test if there is any reasonably conceivable state of facts that could provide a rational basis for distinguishing one group from another. [Citations.] 'Could provide' is the operative phrase; so long as a plausible reason exists for the classification, our inquiry under the rational basis test comes to an end. [Citation.] The reason need only be plausible and need not be supported by evidence or empirical data. [Citations.] 'Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.' [Citation.] 'The burden of demonstrating the invalidity of a legislative classification [enactment] under the rational basis standard rests squarely upon the party who assails it [citation], who must negate every "reasonably conceivable state of facts that could provide a rational basis for the classification." [Citation.]' [Citations.]" (*Chorn v. Workers' Comp. Appeals Bd.* (2016) 245 Cal.App.4th 1370, 1390-1391.)

Keeping this very low bar in mind, in my view it is plausible the Legislature decided that certain crimes—including as applicable here one resulting in an LWOP sentence—are sufficiently egregious and morally depraved that an early parole hearing is unjustified even if the offender was between 18 and 25 years of age at the time of the controlling offense. *Hardin* and the majority brush this point aside with regard to an LWOP sentence controlling offense by comparing various other offenses and resulting hypothetical sentences to conclude the Legislature must have "eschewed any attempt to assess the offenders' overall culpability" when enacting section 3501. (*Hardin*, *supra*, 84

4

Cal.App.5th at p. 289, review granted.) But for purposes of the rational basis test, it does not matter whether the Legislature did or did not attempt to assess overall culpability in crafting section 3051, as opposed to deciding to single out particular types of heinous offenses (as applicable here, special circumstance murder) as ineligible for relief. Instead, section 3051 survives constitutional scrutiny as long as there is "any reasonably conceivable state of facts that could provide a rational basis for distinguishing one group from another." (*Chorn v. Workers' Comp. Appeals Bd.*, *supra*, 245 Cal.App.4th at p. 1390.)

*Hardin* inexplicably concludes the Legislature's "deliberate and focused choice" to exclude an LWOP controlling offense is somehow a bug rather than a feature of section 3051. (*Hardin*, *supra*, 84 Cal.App.5th at p. 290, review granted.) But keeping the standard of review in mind, it is not irrational for the Legislature to determine that someone who commits such a particularly heinous form of murder punished by the most severe sanctions available is ineligible for relief under section 3051, even if other serious offenses resulting in functionally equivalent prison terms are eligible. It is reasonably conceivable the Legislature decided (even if that decision was unsupported by evidence or empirical data) that youthful offenders like Kenneth who are convicted of first degree murder with special circumstances committed an offense sufficiently abominable (and at an age of more maturity than someone under 18) that LWOP should mean LWOP, and/or that such defendants pose a greater danger to society than other offenders such that they should not be released on parole.

Nor does it matter that the Legislature used an admittedly imperfect or even arguably flawed yardstick when distinguishing

who is eligible for a youth offender parole hearing. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." (*Heller v. Doe* (1993) 509 U.S. 312, 321 [113 S.Ct. 2637, 125 L.Ed.2d 257].) A classification does not fail rational-basis review " ' "because in practice it results in some inequality" ' " as " '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' [Citation.]" (*Ibid*.) One could certainly categorize offenses by aggregate sentences or underlying conduct or any number of other criteria that *Hardin* and the majority here might deem more fair or appropriate. Or one could simply conclude everyone who commits any type of offense between the ages of 18 and 25 gets a youthful parole hearing no matter what, which is what *Hardin* seems to suggest. But the Legislature was entitled to paint with a broad brush rather than the different strokes that *Hardin* suggests, even if that results in over and under inclusive outcomes. "Equal protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of" the exclusion in section 3051, subdivision (h) applicable in this case. (*People v. Turnage*, *supra*, 55 Cal.4th at p. 74.)

As illustrated by *Hardin*, concerns with the practical application of section 3051 in certain individual cases are undeniably real, but "we cannot insert our own policy concerns into the analysis." (*People v. Acosta* (2021) 60 Cal.App.5th 769, 781.) Prior opinions have called these concerns to the Legislature's attention and urged it to act. (E.g., *ibid*.; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1039 (conc. opn. of Segal, J.); *In re Jones* (2019) 42 Cal.App.5th 477, 486-487 (conc. opn. of

6

Pollak, P. J.).)  So far, it has declined to do so.  On the other hand, at least one justice has suggested such advocacy is unnecessary to analyzing section 3051's constitutionality.  (See *In re Williams*, *supra*, 57 Cal.App.5th at pp. 439-440 (conc. opn. of Baker, J.).)  No matter how one answers that question, one thing the rational basis test does not empower us to do is redraft the statute to provide eligibility for a parole hearing our elected representatives expressly declined to afford to persons in Kenneth's position.

I therefore respectfully dissent from the court's decision to strike down as unconstitutional section 3051, subdivision (h)'s exclusion of Kenneth's controlling offense from relief under that statute.

WEINGART, J.

7